## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **RYAN ZACHARY ROSS, ERIKA MERCADO,** | ) | |
| **C. LOUIS BUNYA, AND DREW HUNNICUTT,** | ) | |
| on behalf of themselves and all others similarly | ) | |
| situated, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 4:21-cv-292** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **ROBINHOOD FINANCIAL LLC,** | ) | **CLASS ACTION COMPLAINT** |
| **ROBINHOOD SECURITIES, LLC,** | ) | |
| **ROBINHOOD MARKETS, INC.,  TD** | ) | |
| **AMERITRADE, INC., TD AMERITRADE** | ) | |
| **CLEARING, INC., TD AMERITRADE** | ) | |
| **HOLDING CORPORATION, THE CHARLES** | ) | **JURY DEMANDED** |
| **SCHWAB CORPORATION, AND WEBULL** | ) | |
| **FINANCIAL LLC,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

Plaintiffs, Ryan Zachary Ross ("Ross"), Erika Mercado ("Mercado"), C. Louis Bunya ("Bunya"), and Drew Hunnicutt ("Hunnicutt"), on behalf of themselves and all others similarly situated, file this Class Action Complaint against Defendants Robinhood Financial LLC, Robinhood Securities, LLC, Robinhood Markets, Inc., TD Ameritrade, Inc., TD Ameritrade Clearing, Inc., TD Ameritrade Holding Corporation, The Charles Schwab Corporation, and Webull Financial LLC (collectively "Defendants"), alleging as follows:

## INTRODUCTION

1.     This lawsuit involves a collective injury inflicted on a massive pool of individual stock purchasers during one of the most fascinating and transformative moments American finance has seen in decades.

2.     Over the past several weeks, an online forum of clever and eccentric amateur stock enthusiasts, having grown increasingly frustrated by the stranglehold major players maintain over the world of finance, began developing a strategy to capitalize on over-exposed short positions held by some of the nation's most aggressive hedge funds.

3.     Noting that short positions for declining video game retailer GameStop far exceeded the available stock, they theorized that a collective buying movement coordinated through the online forum could raise the price of stock, potentially triggering a price-inflationary feedback-loop known as a "short squeeze," ultimately punishing the hedge funds and transferring a large sum of their money to individual investors. To do this, the online group needed to make the stock an internet meme.

4.     Their plan began to slowly gain steam over mid-January 2021. Other heavily shorted and financially troubled businesses were targeted for meme status in the same way. By Tuesday, January 26th, 2021, the wider world began to take notice of GameStop and other "Meme Stocks." As the prices rose and understanding began to spread about the ideological underpinnings of the Meme Stock concept, public interest in trading these stocks grew dramatically.

5.     Over the past few years, public entry to stock trading has been reduced by the introduction of greatly simplified and scaled down trading apps for web and mobile devices, such as the services created, offered, and maintained by Defendants. These Defendants have become especially popular and heavily used by the entry-level retail investor. As such, when the Meme

Stocks came to wider public attention, Defendants' trading platforms were chief destinations for these investors.

6.     On Wednesday, January 27, 2021, the meme stocks all underwent explosive growth in prices along with a corresponding rise in public interest.

7.     After the trading day on Wednesday, TD Ameritrade informed its customers that it was enacting restrictions on its users' ability to trade certain meme stocks, including GameStop (GME), and AMC Entertainment Holding, Inc. (AMC).[1]

8.     Early Thursday morning at 7:15 a.m., a social media user posted a message noting that Robinhood was no longer allowing new purchases of the most popular meme stocks, notably GME, AMC, Nokia ("NOK").[2] Shortly thereafter, at 7:58 a.m., a user posted a screenshot of the Robinhood app showing an error message disallowing additional purchases of AMC.[3]

9.     An hour later, at 8:56 a.m., Robinhood belatedly announced it was restricting purchases on the meme stocks.[4] Almost immediately following Robinhood's announcement, Defendant Webull also informed its retail customers that new purchases would not be allowed for GME, AMC, and KOSS.[5]

10.     At 9:00 a.m., the price of GME stock was $469. By 9:20, the price fell to $369. By 10:00, the price continued to fall to $264. By 10:20, it had plummeted to $125.

11.     Over the next hour, with Defendants' retail customers excluded from purchasing and many having sold their shares in panic, a large volume of purchases began gobbling up GME stock at low prices, ultimately boosting the price back above $300. The stock continued heavy

[1] https://www.wsj.com/articles/outages-continue-to-plague-online-brokerages-11611768827
[2] https://twitter.com/RampCapitalLLC/status/1354780260924063746
[3] https://twitter.com/grinchposting/status/1354790839986216965
[4] https://twitter.com/RobinhoodApp/status/1354805613566410756
[5] https://www.newsweek.com/webull-blocks-gamestop-amc-transactions-stock-market-robinhood-1565172

trading the remainder of the day. Stock prices for AMC and NOK showed identical behavior, with the same dramatic rises and falls as the sales and purchases played out.

12.     As this process occurred, millions of dollars were made by traders on this historic and unprecedented day, but Defendants' customers were entirely excluded from the process. Even worse, Defendants' actions manipulated the course of the Meme Stocks, disrupting a crowd-sourced collective purchasing strategy in the midst of enormous public enthusiasm and interest in trading these stocks.

13.     In short, the situation that was unfolding was a threat to traditional players in the finance industry, many of whom were Defendants' largest customers, and it could not be allowed to continue. The perfect storm of circumstances and external pressures caused these Defendants, enormously popular in the online retail trading industry, to arrive at a common understanding of what must be done, which they carried out with conscious parallelism. This understanding violated the underlying customer contracts, breached fiduciary duties, and violated the U.S. antitrust law on anti-competitive conduct and price fixing.

## THE PARTIES

### *Plaintiffs*

14.     Plaintiff Ryan Zachary Ross is a resident and citizen of Harris County, Texas.

15.     Plaintiff Erika Mercado is a resident and citizen of Harris County, Texas.

16.     Plaintiff C. Louis Bunya is a resident and citizen of Orange County, California.

17.     Plaintiff Drew Hunnicutt is a resident and citizen of Harris County, Texas.

### *Robinhood Defendants*

18.     Defendant Robinhood Financial LLC is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025.  It is a wholly owned

subsidiary of Robinhood Markets, Inc. Robinhood Financial LLC is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC"). Defendant Robinhood Financial LLC acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities, LLC.

19.     Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc. Defendant Robinhood Securities, LLC is registered as a broker-dealer with the SEC. Defendant Robinhood Financial LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant Robinhood Financial.

20.     Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. Defendant Robinhood Markets, Inc. is the corporate parent of Defendants Robinhood Financial LLC and Robinhood Securities, LLC.

21.     The above-named corporate defendants herein referred to collectively as "Robinhood."

### *TD Ameritrade Defendants*

22.     Defendant TD Ameritrade, Inc. is a New York corporation with its principal place of business at 200 S. 108th Avenue, Omaha, Nebraska 68154. TD Ameritrade, Inc. is a subsidiary of TD Ameritrade Holdings Corporation which is in turn a wholly owned subsidiary of The Charles Schwab Corporation.

23.     Defendant TD Ameritrade Clearing, Inc. is a Nebraska corporation with its principal place of business at 200 S. 108th Avenue, Omaha, Nebraska 68154. TD Ameritrade

Clearing, Inc. is a subsidiary of TD Ameritrade Holdings Corporation which is in turn a wholly owned subsidiary of The Charles Schwab Corporation.

24.     Defendant TD Ameritrade Holding Corporation is a Delaware corporation with its principal place of business at 200 S. 108th Avenue, Omaha, Nebraska 68154.  TD Ameritrade is a wholly owned subsidiary of The Charles Schwab Corporation.

25.     Defendant The Charles Schwab Corporation is a Delaware corporation with its principal place of business at 211 Main Street, San Francisco, California 94105.

26.     The above-named corporate defendants herein referred to collectively as "TD Ameritrade."

### *Webull Defendants*

27.     Defendant Webull Financial LLC ("Webull") is a Chinese-owned financial company with its principal place of business in the United States at 44 Wall Street, Ste 501, New York, New York 10005.  Webull, is a broker-dealer registered with the SEC.  Webull Financial LLC is also a member of the Financial Industry Regulatory Authority ("FINRA"), Securities Investor Protection Corporation ("SIPC"), The New York Stock Exchange ("NYSE") and NASDAQ.

## JURISDICTION

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d)(2).  The aggregate claims of all members of the proposed class are in excess of $5 million, exclusive of interest and costs, and there are more than 100 putative class members.  Many members of the proposed class are citizens of a state different from Defendants.

29.     This Court has personal jurisdiction over Defendants because they are authorized to do business and do conduct business in this District, and because they have specifically

marketed, advertised, and made substantial sales in this District, and have sufficient minimum contacts with this District and/or sufficiently avail themselves of the markets of this state through their promotion, sales, and marketing within this District such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

## VENUE

30.     Venue is proper against Defendants in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District where Defendants, distributed, marketed, advertised, and sold the trading services which are the subject of the present complaint.  Finally, venue is appropriate in this District pursuant to 28 USC § 1391(b)(2) because a substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from this District.

## CO-CONSPIRATORS AND AGENTS

31.     Defendants' anticompetitive and unlawful acts were authorized, ordered, or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaging in the management, discretion, or control of Defendants' business or affairs.

32.     Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged in this complaint and may have performed acts and made statements in furtherance of such violations.

33.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and course of conduct alleged in this complaint.

34.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged in this complaint were consensually formed

between the Defendant principals and agents.  Defendants' agents acted within the scope of their agency relationship with their own principals.  Defendants' agents acted under the explicit, implied, or apparent authority of their principals.  Further, Defendants acted on behalf of and were subject to the control of their principals, and they acted within the scope of authority or power delegated by their principals.

35.    Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority.

## BACKGROUND

36.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

37.    This is an action against online brokerage firms for engaging in an anticompetitive conspiracy through conscious parallelism that impacted the value of various securities by preventing individual retailer investors who utilize these firms from being able to purchase specific stocks, including but not limited to GameStop Corp. ("GME"), AMC Entertainment ("AMC"), and Nokia ("NOK"), and further restricting transactions related to these securities.  In addition to preventing these securities from being purchased, Defendants also raised the margin requirements for certain securities, further impacting retailer investors ability to purchase particular securities. The result of this illegal market manipulation by these online brokerage firms was to drive the stock price of the specific securities down which led to the damages suffered by the Plaintiff and those similarly situated.

38.    Plaintiff Ross, through Defendant Robinhood, purchased and owned 1 share of GME prior to January 28, 2021.

39.     Plaintiff Ross, through Defendant Robinhood, purchased and owned 77 shares of AMC prior to January 28, 2021.

40.     Plaintiff Ross, through Defendant Robinhood, purchased and owned 688 shares of NOK prior to January 28, 2021.

41.     Plaintiff Mercado, through Defendant Webull, purchased and owned 100 shares of AMC prior to January 28, 2021.

42.     Plaintiff Mercado, through Defendant Webull, purchased and owned 100 shares of GME prior to January 28, 2021.

43.     Plaintiff Bunya, through Defendant TD Ameritrade, purchased and owned 100 shares of AMC prior to January 28, 2021.

44.     Plaintiff Bunya, through Defendant Robinhood, purchased and owned shares of AMC prior to January 28, 2021.

45.     Plaintiff Bunya, through Defendant Robinhood, purchased and owned shares of NOK prior to January 28, 2021.

46.     Plaintiff Hunnicutt, through Defendant Robinhood, purchased and owned 75 shares of AMC prior to January 28, 2021.

47.     Plaintiff Ross suffered economic damages as a direct result of the actions of the Defendants related to the securities that he owned, specifically, GME, AMC, and NOK.

48.     Plaintiff Mercado suffered economic damages as a direct result of the actions of the Defendants related to the securities that he owned, specifically, GME, AMC and NOK.

49.     Plaintiff Bunya suffered economic damages as a direct result of the actions of the Defendants related to the securities that he owned, specifically, AMC and NOK.

50.     Plaintiff Hunnicutt suffered economic damages as a direct result of the actions of the Defendants related to the securities that he owned, specifically, AMC.

### Robinhood Defendants

51.     Robinhood is an online brokerage firm.  Its customers place securities trades through the firm's website, by using a web-based application (or "app").  Robinhood permits customers to purchase and sell securities, including futures contracts.

52.     Robinhood has experienced significant growth as a relatively new online brokerage firm.  In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation.  The firm markets itself primarily to younger investors and claims over 10 million users of its trading app.

53.     On or about March 23, 2016, Robinhood's official Twitter account stated: "*Let the people trade*." They have since disregarded their mantra and have blocked access for millions of its customers to trade specific securities.

54.     On or around January 11, 2021, stocks in GameStop Corp. ("GME") began to rise.

55.     At that time, Robinhood allowed retail investors to trade GME on the open market.

56.     On or around January 14, 2021, stocks in AMC Entertainment Holdings Inc. ("AMC") also began to rise.

57.     At that time, Robinhood allowed retail investors to trade AMC on the open market.

58.     On or around January 13, 2021, stocks in Nokia ("NOK") began to rise.

59.     At that time, Robinhood allowed retail investors to trade NOK on the open market.

60.     On or about January 27, 2021, Robinhood, while attempting to slow the growth of these securities, and in an effort to deprive their customers of the ability to use their service, abruptly, purposefully, willfully, and knowingly denied access to specific securities on their app.

This willful action meant retail investors could no longer buy, or even search for, GME, AMC, NOK, and others on Robinhood's app.

61.     On information and belief, Robinhood's actions were done purposefully and knowingly to manipulate the market for the benefit of individuals and financial intuitions and to the detriment of Robinhood's retail trading customers.

62.     Since restricting the purchase of these securities from their app, the stock's prices have gone up, depriving many investors of potential gains.

63.     Additionally, in the event GME or similar securities go down in price, Robinhood has deprived investors of "shorting" those securities in the hopes the price drops.

64.     Additionally, during the period of extreme interest and price movement on January 28, 2021, Robinhood's retail customers could have secured profits from a combination of purchases and sales at different points throughout the trading day during this historic event.

65.     Robinhood completely blocked retail investors from purchasing GME, AMC, and NOK for no legitimate reason, thereby depriving retailer investors from the benefits of Robinhood's services.

66.     Robinhood continued to restrict purchases of other securities, including but not limited to GME, AMC, and NOK, knowingly manipulating the market price by doing so.

### *TD Ameritrade Defendants*

67.     TD Ameritrade is an online broker that offers an electronic trading platform for the trade of financial assets including common stocks, preferred stocks, futures contracts, exchange-traded funds, options, cryptocurrency, mutual funds, and fixed income investments.

68.     TD Ameritrade markets itself primarily to "smarter" investors and claims over 11 million client accounts that total more than $1 trillion in assets.

69.     On or around January 11, 2021, stocks in GameStop Corp. ("GME") began to rise.

70.     At that time, TD Ameritrade allowed retail investors to trade GME on the open market.

71.     On or around January 14, 2021, stocks in AMC Entertainment Holdings Inc. ("AMC") also began to rise.

72.     At that time, TD Ameritrade allowed retail investors to trade AMC on the open market.

73.     On or about January 27, 2021, TD Ameritrade, while attempting to slow the growth of these securities, and in an effort to deprive their customers of the ability to use their service, abruptly, purposefully, willfully, and knowingly restricted purchases of GME, AMC, and others. This willful action meant retail investors could no longer buy these securities.

74.     On information and belief, TD Ameritrade's actions were done purposefully and knowingly to manipulate the market for the benefit of individuals and financial intuitions who were not TD Ameritrade's customers.

75.     These actions have deprived many investors of potential gains.

76.     TD Ameritrade continues to restrict these and other securities on its app for no legitimate reason.

***Webull Defendants***

77.     Webull is a "mobile-first," financial services company that offers commission-free trading of stocks, Exchange-Traded Funds ("ETFs"), and options.  Webull is a "self-directed brokerage app with tools to help execute trades, research stocks and more."

78.     In 2020, Webull increased its roster of brokerage clients by about tenfold, to more than 2 million, by offering free stock trades with a slick online interface.

12

79.     On or around January 11, 2021, stocks in GameStop Corp. ("GME") began to rise.

80.     At that time, Webull allowed retail investors to trade GME on the open market.

81.     On or around January 14, 2021, stocks in AMC Entertainment Holdings Inc. ("AMC") also began to rise.

82.     At that time, TD Ameritrade allowed retail investors to trade AMC on the open market.

83.     On or about January 27, 2021, Webull, while attempting to slow the growth of these securities, and in an effort to deprive their customers of the ability to use their service, abruptly, purposefully, willfully, and knowingly restricted trading of GME and AMC.  This willful action meant retail investors could no longer buy these securities because Webull limited the transactions to closing positions only.

84.     On information and belief, Webull's actions were done purposefully and knowingly to manipulate the market for the benefit of individuals and financial intuitions who were not Webull customers.

85.     These actions have deprived many investors of potential gains.

**_All Defendants_**

86.     The Financial Industry Regulatory Authority ("FINRA"), which governs brokers like Defendants, espouses rule 5310 regarding "Best Execution and Interpositioning." Rule 5310.01 requires that firms like Defendants' "*must make every effort to execute a marketable customer order that it receives promptly and fully*." By failing to respond at all to customers' placing timely trades, outright blocking customers from trading a specific securities, and restricting others, Defendants have breached these, among other, obligations and caused their customers substantial losses due solely to their own negligence, failure to maintain adequate infrastructure.

87.     On information and belief, Defendants' acts of restricting securities transactions were an intentional effort to slow growth and to help benefit individuals and institutions who are not their customers, but are large institutional investors, potential investors, or other financial institutions.

88.     The actions of all Defendants occurred within a few hours of each other and all Defendants restricted substantially the same specific securities.

## CLASS ACTION

89.     Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

90.     Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following putative Classes, as defined below:

**CLASS 1: All investors who owned securities in GameStop Corp. ("GME") on January 28, 2021 that was purchased prior to January 28, 2021.**

**CLASS 2: All investors who owned or securities in AMC Entertainment Holdings Inc. ("AMC") on January 28, 2021 that was purchased prior to January 28, 2021.**

**CLASS 3: All investors who owned or securities in Nokia ("NOK") on January 28, 201 that was purchased prior to January 28, 2021.**

91.     Additionally, or in the alternative, Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Subclass, as defined below:

**SUBCLASS 1: All Robinhood customers who were not able to execute trades on January 28, 2021 related to specific securities after Robinhood knowingly, willfully, and purposefully removed it completely from their platform.**

**SUBCLASS 2: All TD Ameritrade customers who were not able to execute trades related to specific securities after TD Ameritrade knowingly, willfully, and purposefully restricted transactions.**

**SUBCLASS 3: All Webull customers who were not able to execute trades related to specific securities after Webull knowingly, willfully, and purposefully restricted transactions.**

92.     This action has been brought and may properly be maintained as a class action against Defendants pursuant to the provisions of Federal Rule of Civil Procedure 23.

93.     **Numerosity**: The precise number of members of the proposed Class is unknown to Plaintiff at this time, but, based on information and belief, Class members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly available reports, Class members number in the hundreds of thousands and up to ten million. Subclass members are likely in the thousands. All Class and Subclass members may be notified of the pendency of this action by reference to Defendants' business records, or by other alternative means.

94.     **Commonality**: Numerous questions of law or fact are common to the claims of Plaintiff and members of the proposed Classes. These common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to the following:

a.  Whether Defendants knowingly failed to provide the financial services that were needed to handle reasonable consumer demand, including trading securities that are available on every other competitive trading platform;

b.  Whether Defendants failed to provide the duty of care to their customers when they purposefully restricted transactions;

c.  Whether Defendants restricted transactions purposefully to harm their customers' positions in these securities and benefit their own potential financial gains;

d. Whether Defendants violated FINRA Rule 5310, among other FINRA rules, state rules, and federal regulations;

e. Whether Defendants violated consumer protection laws in failing to disclose that their services would place restrictions on GME, and other securities, for substantial periods of time;

f. Whether Defendants were in breach of their legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

g. Whether Defendants were in breach of their contracts and/or the implied covenant of good faith and fair dealing in connection with their failure to provide financial services;

h. Whether Defendants were negligent or grossly negligent by failing to provide financial services in a timely manner due to their own possible nefarious desires;

i. Whether Defendants breached their fiduciary duties to customers by failing to provide adequate access to financial services;

j. Whether Defendants were unjustly enriched by their conduct;

k. Whether Defendants colluded with one another to illegal manipulate the stock market in order to protect their own interests or the interests of potential investors or financial institutions that were not their customers, the millions retail investors;

l. Whether Plaintiff and the other Class members were injured by Defendants' conduct, and if so, the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief.

m. Whether Plaintiff and the other Class members are entitled to injunctive and declaratory relief.

95.     **Typicality**: The claims of the named Plaintiffs are typical of the claims of the proposed Classes in that the named Plaintiffs were customers and retail investors during the class period and were unable to trade specific securities and place time-sensitive trades on those securities based on Defendants' restrictions and sustained damages as a result of Defendants' wrongful conduct.

96.     **Adequate Representation**: Plaintiffs will fairly and adequately represent the interests of the Class in that they have no conflicts with any other Class members.  Plaintiffs have retained competent counsel experienced in prosecuting complex class actions, including those involving financial services, and they will vigorously litigate this class action.

97.     **Predominance and Superiority**: There is no plain, speedy, or adequate remedy other than by maintenance of this class action.  A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy.  Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.  Additionally, given the relatively modest damages sustained by most individual Class members, few, if any, proposed Class members could or would sustain the economic burden of pursuing individual remedies for Defendants' wrongful conduct.  Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court.  This class action presents no material difficulties in management.

98.     Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Classes would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants.

99.     Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Classes would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

100.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. Civ. P. 23(b)(2) are met as Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole.

101.    Class action certification is also warranted under Fed. R. Civ P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy. The amount of damages available to the individual Plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible for most, in the absence of the class action procedure.  Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

102.    Class action certification is also warranted under Fed. R. Civ P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class wide basis.

## CAUSE OF ACTION I
### For Breach of Contract – Robinhood

103.     Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

104.     In order to use the Robinhood trading platform, a potential customer must enter into the Customer Agreement with Robinhood.

105.     Plaintiffs and other class members did enter into a Customer Agreement with Robinhood.

106.     Robinhood breached its Customer Agreement by, among other things, failing to disclose that its platform was going to randomly pull a profitable stock from its platform; that Robinhood failed to provide adequate explanation to their customers; that Robinhood knowingly put their customers at a disadvantage compared to customers who used other trading apps; that Robinhood failed to provide access to its own financial incentives to halt purchases on certain securities including GME, AMC, and NOK; that Robinhood's prohibited plaintiffs from performing in a timely manner (or at all) under the contract; that Robinhood failed to comply with all applicable legal, regulatory, and licensing requirements; and that Robinhood failed to exercise trades and actions requested by customers.

107.     As such, Robinhood breached its Customer Agreement with Plaintiff and Class members.

108.     Robinhood's failure to perform and its breaches of the Customer Agreement resulted in damages and losses to Plaintiff and Class members and continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiff and Class members in an amount to be determined at trial or separate proceedings, as necessary.

## CAUSE OF ACTION II
## For Breach of Contract – TD Ameritrade

109.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

110.    In order to use the TD Ameritrade trading platform, a potential customer must enter into the Customer Agreement with TD Ameritrade.

111.    Plaintiffs and other class members did enter into a Customer Agreement with TD Ameritrade.

112.    TD Ameritrade breached its Customer Agreement by, among other things, failing to disclose that its platform was going to randomly restrict transactions related to particular securities; that TD Ameritrade failed to provide adequate explanation to their customers; that TD Ameritrade knowingly put their customers at a disadvantage compared to customers who used other trading apps; that TD Ameritrade failed to provide access to further its own financial incentives to halt purchases on certain securities; that TD Ameritrade prohibited plaintiffs from performing in a timely manner (or at all) under the contract; that TD Ameritrade failed to comply with all applicable legal, regulatory, and licensing requirements; and that TD Ameritrade failed to exercise trades and actions requested by customers.

113.    As such, TD Ameritrade breached its Customer Agreement with Plaintiff and Class members.

114.    TD Ameritrade's failure to perform and its breaches of the Customer Agreement resulted in damages and losses to Plaintiffs and Class members and continues to expose them to harm because TD Ameritrade continues to fail to perform under the Customer Agreement.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings, as necessary.

20

## CAUSE OF ACTION III
### For Breach of Contract – Webull

115.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

116.    In order to use the Webull trading platform, a potential customer must enter into the Customer Agreement with Robinhood.

117.    Plaintiffs and other class members did enter into a Customer Agreement with Webull.

118.    Webull breached its Customer Agreement by, among other things, failing to disclose that its platform was going to randomly restrict transactions related to particular securities; that Webull failed to provide adequate explanation to their customers; that Webull knowingly put their customers at a disadvantage compared to customers who used other trading apps; that Webull failed to provide access to further its own financial incentives to halt purchases on certain securities; that Webull prohibited plaintiffs from performing in a timely manner (or at all) under the contract; that Webull failed to comply with all applicable legal, regulatory, and licensing requirements; and that Webull failed to exercise trades and actions requested by customers.

119.    As such, Webull breached its Customer Agreement with Plaintiff and Class members.

120.    Webull's failure to perform and its breaches of the Customer Agreement resulted in damages and losses to Plaintiffs and Class members and continues to expose them to harm because Webull continues to fail to perform under the Customer Agreement.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings, as necessary.

## CAUSE OF ACTION IV
## Breach of the Implied Covenant of Good Faith and Fair Dealing – Robinhood

121.     Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

122.     Plaintiffs and members of the Class and Subclass entered into the Customer Agreement with Defendant Robinhood to open a Robinhood trading account. They agreed to Robinhood's Terms and Conditions by using Robinhood's website and trading platform.

123.     Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to their terms and using Robinhood's trading services through its website and trading platform.

124.     Robinhood was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for GME, AMC, and NOK.

125.     When initially signing up for Robinhood, Plaintiffs and all those similarly situated could, and most actually did, trade GME, AMC, and NOK.

126.     Robinhood unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying specific securities for Robinhood's own pecuniary interest and not disclosing those interest to Plaintiffs and all Class and Subclass members.

127.     Robinhood's conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages.  These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings, as necessary.

**CAUSE OF ACTION V**
**Breach of the Implied Covenant of Good Faith and Fair Dealing – TD Ameritrade**

128.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

129.    Plaintiffs and members of the Class and Subclass entered into the Customer Agreement with Defendant TD Ameritrade to open a TD Ameritrade trading account. They agreed to TD Ameritrade's Terms and Conditions by using TD Ameritrade's website and trading platform.

130.    Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to their terms and using TD Ameritrade's trading services through its website and trading platform.

131.    TD Ameritrade was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for AMC.

132.    When initially signing up for TD Ameritrade, Plaintiffs and all those similarly situated could, and most actually did, trade AMC.

133.    TD Ameritrade unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying specific securities for TD Ameritrade's own pecuniary interest and not disclosing those interest to Plaintiffs and all Class and Subclass members.

134.    TD Ameritrade's conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages.  These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings, as necessary.

**CAUSE OF ACTION VI**
**Breach of the Implied Covenant of Good Faith and Fair Dealing – Webull**

135.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

136.    Plaintiffs and members of the Class and Subclass entered into the Customer Agreement with Defendant Webull to open a Webull trading account. They agreed to Webull's Terms and Conditions by using Webull's website and trading platform.

137.    Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to their terms and using Webull's trading services through its website and trading platform.

138.    Webull was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for GME and AMC.

139.    When initially signing up for Webull, Plaintiffs and all those similarly situated could, and most actually did, trade GME and AMC.

140.    Webull unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying specific securities for Webull's own pecuniary interest and not disclosing those interest to Plaintiffs and all Class and Subclass members.

141.    Webull's conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages.  These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings, as necessary.

**CAUSE OF ACTION VII**
**Negligence - Robinhood**

142.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

143.    Robinhood had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

144.    Robinhood had a duty to exercise reasonable care in providing trades on the free, open market for its customers.

145.    Robinhood unlawfully breached its duties by, among other things, (i) restricting purchases on highly desired securities such as GME, AMC, and NOK without notice from its trading app; (ii) failing to provide financial services related to those securities; (iii) failing to notify customers in a timely manner of the purchasing "blackout" on these highly desired securities.

146.    Robinhood's conduct as set forth in this Complaint was want of even scant care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct. Indeed, they were extreme and outrageous. Their actions breach any duty of care to their customers but are also inconsistent with the standard of care expected from similar firms in the open market.

147.    Upon information and belief, no institutions similar to Robinhood has ever outright banned customers from purchasing a specific share of a specific security.

148.    Robinhood abandoned its customers by restricting transactions related to highly desired securities such as GME, AMC, and NOK, a standard of care so far below what is required

25

for a business engaging in time sensitive trading services that it amounts to a complete abandonment of its duties.

149.    Robinhood's grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Robinhood's gross breach of its duty of due care. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings, as necessary.

**CAUSE OF ACTION VII**
**Negligence – TD Ameritrade**

150.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

151.    TD Ameritrade had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

152.    TD Ameritrade had a duty to exercise reasonable care in providing trades on the free, open market for its customers.

153.    TD Ameritrade unlawfully breached its duties by, among other things, (i) restricting purchases on highly desired securities such as AMC, without notice from its trading app; (ii) failing to provide financial services related to those securities; (iii) failing to notify customers in a timely manner of the purchasing restrictions on these highly desired securities.

154.    TD Ameritrade's conduct as set forth in this Complaint was want of even scant care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct. Indeed, they were extreme and outrageous. Their actions breach any duty of care to their customers but are also inconsistent with the standard of care expected from similar firms in the open market.

155.    TD Ameritrade abandoned its customers by restricting transactions related to highly desired securities such as AMC, a standard of care so far below what is required for a business engaging in time sensitive trading services that it amounts to a complete abandonment of its duties.

156.    TD Ameritrade's grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for TD Ameritrade's gross breach of its duty of due care. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings, as necessary.

### CAUSE OF ACTION IX
### Negligence - Webull

157.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

158.    Webull had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

159.    Webull had a duty to exercise reasonable care in providing trades on the free, open market for its customers.

160.    Webull unlawfully breached its duties by, among other things, (i) restricting purchases on highly desired securities such as GME and AMC, without notice from its trading app; (ii) failing to provide financial services related to those securities; (iii) failing to notify customers in a timely manner of the purchasing restrictions on these highly desired securities.

161.    Webull's conduct as set forth in this Complaint was want of even scant care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct. Indeed, they were extreme and outrageous. Their actions breach any duty of care to their

customers but are also inconsistent with the standard of care expected from similar firms in the open market.

162.    Webull abandoned its customers by restricting transactions related to highly desired securities such as GME and AMC, a standard of care so far below what is required for a business engaging in time sensitive trading services that it amounts to a complete abandonment of its duties.

163.    Webull's grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Webull's gross breach of its duty of due care. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings, as necessary.

## CAUSE OF ACTION X
### Breach of Fiduciary Duty - Robinhood

164.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

165.    As a licensed provider of financial services, Robinhood at all times relevant herein was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf.  Robinhood also acted as a fiduciary to each and every customer who agreed to the Customer Agreement.

166.    Robinhood breached its fiduciary duties to Plaintiffs and Class members by, among other things, restricting purchases on highly desired securities such as GME, AMC, and NOK, failing to disclose in a timely manner that Robinhood would be restricting purchases; restricting purchases on highly desired securities for its own pecuniary benefits; failing to provide access to its financial services in a timely manner; failing to comply with all applicable legal, regulatory,

and licensing requirements; and failing to exercise trades and actions requested by customers in a complete and timely manner (also required by FINRA Rule 5310).

167.    Robinhood's conduct has caused Plaintiffs and Class members harm, losses, and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings, as necessary.

**CAUSE OF ACTION XI**
**Breach of Fiduciary Duty – TD Ameritrade**

168.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

169.    As a licensed provider of financial services, TD Ameritrade at all times relevant herein was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf.  TD Ameritrade also acted as a fiduciary to each and every customer who agreed to the Customer Agreement.

170.    TD Ameritrade breached its fiduciary duties to Plaintiffs and Class members by, among other things, restricting purchases on highly desired securities such as GME and AMC, failing to disclose in a timely manner that TD Ameritrade would be restricting purchases; restricting purchases on highly desired securities for its own pecuniary benefits; failing to provide access to its financial services in a timely manner; failing to comply with all applicable legal, regulatory, and licensing requirements; and failing to exercise trades and actions requested by customers in a complete and timely manner (also required by FINRA Rule 5310).

171.    TD Ameritrade's conduct has caused Plaintiffs and Class members harm, losses, and damages and continues to expose them to harm because TD Ameritrade continues to breach

its fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings, as necessary.

## CAUSE OF ACTION XII
### Breach of Fiduciary Duty - Webull

172.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

173.    As a licensed provider of financial services, Webull at all times relevant herein was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf.  Webull also acted as a fiduciary to each and every customer who agreed to the Customer Agreement.

174.    Webull breached its fiduciary duties to Plaintiffs and Class members by, among other things, restricting purchases on highly desired securities such as GME and AMC, failing to disclose in a timely manner that Webull would be restricting purchases; restricting purchases on highly desired securities for its own pecuniary benefits; failing to provide access to its financial services in a timely manner; failing to comply with all applicable legal, regulatory, and licensing requirements; and failing to exercise trades and actions requested by customers in a complete and timely manner (also required by FINRA Rule 5310).

175.    Webull's conduct has caused Plaintiffs and Class members harm, losses, and damages and continues to expose them to harm because Webull continues to breach its fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings, as necessary.

## CAUSE OF ACTION XIII
### Violations of the Sherman Act – 15 U.S.C. § 1

176.     Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

177.     Plaintiffs bring this claim against all Defendants on behalf of the Class under federal law.

178.     Section 1 of the Sherman Act provides that "[e]very contract, combination, . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." Understandings between competitors at the same market level to fix or control prices are *per se* unlawful.

179.     Defendants and their co-conspirators entered into a common understanding to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by wrongfully manipulating the transactions related to specific commodities, to whit particular securities, in the United States.

180.     Defendants engaged in conduct that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects on interstate commerce.

181.     In particular, Defendants have combined and conspired to prevent and manipulate the purchasing of specific securities by their collective retail investors.

182.     As a result of Defendants' unlawful conduct, the stock prices for the specific securities in question were drastically impacted and the resulting loss to Plaintiffs and the members of the putative Classes is substantial.

183.     The combination or conspiracy among Defendants consisted of a concerted action among Defendants.

184.    Such a combination or conspiracy existed by explicit agreement, or alternatively, can be inferred on the basis of conscious parallelism in light of the surrounding circumstantial evidence.

185.    Defendants were conscious of each other's conduct over the course of January 28, 2021, and this awareness was an element in their decision to restrict purchases over the entirety of the trading day.

186.    Over the course of the day, Defendants understood the ongoing effects of their concerted actions and intended that result.

187.    Defendants had a motive for concerted action. These motivations arose from many factors, including but not limited to: 1) pecuniary gain both direct and indirect from third-parties, 2) ideological, philosophical, and pecuniary motivations to stymie the Meme Stock trading strategy which had terrified the market; 3) pressure exerted by large-scale customers, large-scale finance industry actors, or government officials; 4) fear of backlash among influential actors in the finance industry for facilitating the Meme Stock collective retail trading strategy; 5) fear of political or regulatory backlash; and 6) other various pecuniary, ideological, or regulatory fears specific to each Defendant which caused them to enter into the common understanding as how to confront the Meme Stock problem.

188.    In taking these simultaneous, unprecedented actions, the Defendants acted in ways which appear to show actions against self-interest were it not for the common understanding and its underlying motives.

189.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did the following:

a.   restricted many of the same particular securities as one another;

    b.   prohibited the purchase of securities in order to manipulate the value of those securities for their own pecuniary interests and the benefits of third parties, to the detriment of their retail trading customers;

    c.   adjusted the margin requirements for the purchase of specific securities in order to manipulate the market; and

    d.   knowingly and intentionally caused negative impact to the potential gains of their retail trading customers.

190.    As a result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in an amount to be determined at trial or separate proceedings as necessary.

191.    The alleged collusion, combination, or civil conspiracy is a *per se* violation of the federal antitrust laws.

## CAUSE OF ACTION XIV
## Violations of State Antitrust Laws

192.    Plaintiffs incorporate by reference each of the allegations above and further allege as follows:

193.    Plaintiffs bring this omnibus claim against all Defendants on behalf of putative Class members who made their relevant securities purchase(s) in Arizona, California, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

194.    For purposes of this omnibus claim, the law of the state in which each putative Class member purchased their relevant securities through any Defendants' service, or through any co-conspirator, or current or former subsidiary of any Defendant, applies to that transaction.

195.    Defendants' conduct in restraint of trade described herein violated the following laws:

    a.  Ariz. Rev. Stat. § 44-1401 *et seq.*

    b.  Cal. Bus. & Prof. Code § 16700 *et seq.*

    c.  D.C. Code § 28-4501 *et seq.*

    d.  Haw. Rev. Stat. § 480-4.

    e.  Iowa Code § 553.1 *et seq.*

    f.  Kan. Stat. Ann. § 50-101 *et seq.*

    g.  Me. Rev. Stat. Ann. tit. 10, § 1101 *et seq.*

    h.  Mich. Comp. Laws § 445.771 *et seq.*

    i.  Minn. Stat. § 325D.49 *et seq.*

    j.  Miss. Code Ann. § 75-21-1 *et seq.*

    k.  Neb. Rev. Stat. § 59-801 *et seq.*

    l.  Nev. Rev. Stat. § 598A.010 *et seq.*

    m.  N.H. Rev. Stat. Ann. tit. XXXI, § 356:1 *et seq.*

    n.  N.M. Stat. § 57-1-1 *et seq.*

    o.  N.Y. Gen. Bus. Law, § 340 *et seq.*

    p.  N.C. Gen. Stat. § 75-1 *et seq.*

    q.  N.D. Cent. Code § 51-08.1 *et seq.*

    r.  Or. Rev. Stat. § 646.705 *et seq.*

    s.  R.I. Gen. Laws § 6-36-1 *et seq.*

    t.  S.D. Codified Laws § 37-1-3.1 *et seq.*

    u.  Tenn. Code Ann. § 47-25-101 *et seq.*

    v.  Utah Code Ann. § 76-10-911 *et seq.*

    w.  W. Va. Code § 47-18-1 *et seq.*

    x.  Wis. Stat. § 133.01 *et seq.*

196.    Plaintiffs and putative Class Members who made their relevant securities purchases in the above jurisdictions have been injured by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiff and these putative Class members were unlawfully

restricted in their ability to trade securities they owned as they saw fit.  This injury is of the type

that the antitrust laws of the above states were designed to prevent, and it is an injury that flows

directly from Defendants' conduct.

197.    Plaintiffs and putative Class Members who made their relevant securities purchases

in the above jurisdictions are accordingly entitled to damages, including statutory damages where

applicable, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust

law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above

laws.

### JURY DEMAND

198.    The Plaintiffs demand a jury trial on all issues.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Ryan Zachary Ross, Erika Mercado, C. Louis Bunya, and Drew

Hunnicutt pray for the following relief:

a)      A judgment in favor of Plaintiffs that this action may be maintained as a class action

under Rule 23(a), (b)(2), and (b)(3) and the Court direct that reasonable notice of this action, as

provided under Rule 23(c)(2), be given to each member of the Class;

b)      A judgment in favor of Plaintiffs that Defendants' unlawful conduct, conspiracy,

or combination alleged herein be decreed:

1.  An unreasonable restraint of trade or commerce in violation of Section 1 of the

Sherman Act;

2.   A per se violation of Section 1 of the Sherman Act;

3. An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of carious states' antitrust and unfair competition laws as set forth herein;

c) A judgment in favor of Plaintiffs and members of the Class to recover damages, to the maximum extent allowed under the law;

d) A judgment in favor of Plaintiffs and members of the Class to recover treble damages;

e) A judgment in favor of Plaintiffs and members of the Class to recover costs of suit including reasonable attorneys' fees, as provided by law; and

f) Any and all other relief to which Plaintiffs and members of the Class may be entitled.

Dated this 29th day of January 2021.                    Respectfully submitted,

By: */s/ Gabriel A. Assaad*
Gabriel A. Assaad
Texas Bar No. 24076189
gassaad@mcdonaldworley.com
McDonald "Don" Worley
Texas Bar No. 24003208
don@mcdonaldworley.com
Matthew S. Yezierski
Texas Bar No. 24076989
matt@mcdonaldworley.com
McDonald Worley, PC
1770 St. James St., Suite 100
Houston, TX 77056
(713) 523-5500 – telephone
(713) 523-5501 – facsimile

William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
Farrar & Ball LLP
1117 Herkimer St.
Houston, TX 77008
(713) 221-8300 - telephone
(713) 221-8301 - facsimile

**ATTORNEYS FOR PLAINTIFFS**